## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Terrence T. Williams (#2020-2184),　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　)　　No. 18 C 5563
　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　Hon. Franklin U. Valderrama
Michelle Moffett, et al.,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　)

### MEMORANDUM OPINION AND ORDER

Plaintiff Terrence T. Williams, a detainee at the Will County Adult Detention Facility (WCADF), brought this pro se civil rights action under 42 U.S.C. § 1983 concerning alleged violations of his rights at that facility. Plaintiff claims that prison officials failed to protect him from a fellow prisoner and failed to allow him to follow his religion by providing him non-Kosher meals. Defendants Stuart Taylor, Michelle Moffett, Randy Slayer, and Deakan John (collectively Defendants) have moved for summary judgment (R. 108, Defs.' Mot. Summ. J; R. 109, Defs.' SOF; R. 110, Defs.' Memo. Summ. J.) in this detainee conditions of confinement case, and Plaintiff has responded (R. 114, Pl.'s SOAF; R. 115, Pl.'s Resp. Memo. Summ. J.; 116, Pl.'s Exhs.).[1] For the reasons that follow, the motion is granted in part and denied in part. Summary judgment is granted to (1) all Defendants on Plaintiff's insufficient diet claim; (2) Defendant Taylor on all of Plaintiff's failure to protect claims and

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Defendant Moffett as to any claim arising out of Plaintiff's July 7, 2018, altercation with inmate Smith; and (3) Defendants Moffett and Slater as to any violation of Plaintiff's religious rights. Summary judgment is denied as to: (1) Plaintiff's claim of failure to protect against Defendant Moffett with regard to his July 29, 2018, altercation with inmate Smith; and (2) Plaintiff's Religious Land Use and Institutionalized Persons Act (RLUIPA) and First Amendment claims against Deacon Shea with regard to the denial of a Kosher diet.

## I. Background

Plaintiff is a detainee at the WCADF and brought this *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983. R. 1, 8, Compl. Plaintiff was allowed to proceed with the following claims: (1) a Fourteenth Amendment failure-to-protect claim against Dep. Chief Taylor and Sgt. Moffett; (2) a Fourteenth Amendment insufficient diet claim against Sgt. Moffett and Food Services Supervisor Randi Slater; and (3) a First Amendment/RLUIPA[2] claim against Sgt. Moffett, Slater, and Deacon Shea. R. 7.

Defendants argue they are entitled to summary judgment on the following grounds: (1) Dep. Chief Taylor and Sgt. Moffett contend they were not deliberately indifferent to a threat of serious bodily injury to Plaintiff and were not personally involved in Plaintiff's housing assignments or the failure to keep him separated from

---

[2]RLUIPA prohibits correctional facilities receiving federal funds from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate "that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)-(2); *see Holt v. Hobbs*, 574 U.S.352, 358 (2015) (observing that RLUIPA provides "expansive protection for religious liberty.").

another inmate, Deshawn Smith, on the dates in question; (2) Sgt. Moffett and Slater contend there is no competent evidence to support Plaintiff's claim of an inadequate diet, and regardless, Sgt. Moffett had no control over menu or meal planning; (3) Sgt. Moffett and Slater had no control over Plaintiff's request for a dietary religious accommodation, and Deacon Shea is entitled to judgment on that claim because his decision to not provide a Kosher diet was made in response to Plaintiff's request for regular meals. Although Plaintiff later again requested a Kosher diet, Deacon Shea contends that Plaintiff's refusal of the Kosher diet in the first instance led to a reasonable inference that his religious beliefs were not sincere. Defs.' Mot. Summ. J.

Alternatively, Defendants argue they are entitled to summary judgment because Plaintiff did not exhaust his administrative remedies as to the claims against them. It is not entirely clear as to which claims Defendants make this argument. However, their memorandum in support of their motion indicates that they contend that Plaintiff did not exhaust his remedies as to Plaintiff's claims of failure to protect and a nutritionally deficient diet. *See* Defs.' Memo. Summ. J. at 12–15.

### A.     Northern District of Illinois Local Rule 56.1

Local Rule 56.1 sets out a procedure for presenting facts pertinent to a party's request for summary judgment pursuant to Federal Rule of Civil Procedure 56. Specifically, Local Rule 56.1(a)(3) requires the moving party to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). Each paragraph of the movant's statement of facts

must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). The opposing party must file a response to each numbered paragraph in the moving party's statement, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.*

The district court may limit its analysis of the facts on summary judgment "to evidence that is properly identified and supported in the parties' statements." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000); *see also Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). Plaintiff's status as a *pro se* litigant does not excuse him from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil

4

litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011) (unpublished) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules.").

Because Plaintiff is proceeding *pro se*, Defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. R. 111, Notice. In addition to a memorandum and exhibits (R. 115, 116) Plaintiff submitted a factual response in which he contests aspects of Defendants' affidavits. R. 114, Pl.'s SOAF. But the response does not meet the requirements of Local Rule 56.1 in that it does not provide a response to each numbered paragraph of the Defendants' Statement of Fact, including, in the case of disagreement, a citation to the record. Plaintiff later submitted a belated and defective response to Defendants' Statement of Facts that the Court struck. R. 133, 139.[3] The Court will therefore accept Defendants' Statement of Facts to the extent it is supported by the record. *See Cady*, 467 F.3d at 1060 (district court properly rejected Rule 56.1 statement that did not comply with the local rule); *Milton v. Slota*, 697 F. App'x. 462, 464 (7th Cir. 2017) ("the [district] court was entitled to strictly enforce the local rule, even against a pro se litigant, by deeming uncontroverted statements of material fact admitted for the purpose of deciding summary judgment").

---

[3]The Court also stated in that order that it would disregard any further filings from Plaintiff in which he attempted to revise or supplement his response to Defendants' summary judgment motion.

5

Defendants have treated Plaintiff's first factual response as a Statement of Additional Facts and responded to it (R. 124, Defs.' Resp. PSOF), and the Court will do the same for the sake of clarity. However, while the Court liberally construes these submissions, many of the purported factual statements submitted by Plaintiff are irrelevant, argumentative, consist of legal conclusions or conclusory statements, or are not supported by admissible evidence. The Court will entertain Plaintiff's factual statements only to the extent they are supported by the record or he could properly testify about the matters asserted. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013).

The Court therefore will recite the facts in Defendants' Local Rule 56.1(a)(3) statement and Plaintiff's factual assertions that are properly supported or about which he could testify, and then decide whether, on those facts, Defendants are entitled to summary judgment. With these guidelines in mind, the Court turns to the facts of this case.

### B.    Factual Background

Plaintiff Terrence T. Williams currently is a pretrial detainee at the WCADF and was such at the time of the incident in March 2018. *See* R. 109, Defs.' SOF ¶ 1. At all relevant times, Sgt. Michelle Moffett was the Classification Sergeant at the WCADF. *Id.* ¶ 2. Deputy Chief Stuart Taylor is and was at relevant times the Deputy Chief of Operations at the WCADF. *Id.* ¶ 3. Deacon John Shea served at all relevant times as the facility's chaplain and Director of Pastoral Services through the non-

6

profit Center for Correctional Concerns. *Id.* ¶ 4. Randi Slater is and was at all
relevant times the Food Services Supervisor at the WCADF. *Id.* ¶ 5.

### 1. Facts as to Failure-to-Protect Claim

On June 10, 2018, Plaintiff complained that inmate Deshawn Smith urinated
on his chuckhole while both were housed in the D-Pod. Defs.' SOF ¶ 8. Plaintiff wrote
a grievance about the incident and testified that he and Smith were separated at that
time. *Id.* ¶ 9; *see* R., 109-1, Pl.'s Dep. at 10:13-22; R. 114, Pl.'s SOAF ¶ 7. On July 7,
2018, Plaintiff and Smith were housed in the D-Pod on administrative segregation
when the pod officer, James Demasi, let both of them out of their cells. Defs.' SOF ¶
10. While in the dayroom, Plaintiff and Smith had a quick fight; Plaintiff testified
that he "didn't necessarily receive any injuries." *Id.* ¶ 11; *see* Pl.'s Dep., at 12:21–
13:11.

On July 29, 2018, Plaintiff and Smith were in administrative segregation, with
Plaintiff housed on the upper tier of D-Pod, and Smith on the lower tier. Defs.' SOF
¶ 12. Pod officers Lawrence Talbert and Michael Suggs let Plaintiff and Smith out at
the same time. *Id.* ¶ 13. Plaintiff did not see Smith until Smith ran up the stairs and
met him at his cell door. *Id.* Plaintiff testified that at that point, he had to either fight
or try to run back into his cell. *Id.* ¶ 14; *see* Pl.'s Dep. at 16:3–9. Plaintiff described
the altercation as "pretty fast," and a "grabbing situation," and testified that he did
not experience any injuries. Defs.' SOF ¶ 14; *see* Pl.'s Dep. at 16:10–24. These were
the only two physical incidents between Plaintiff and Smith. Defs.' SOF ¶ 15.

Plaintiff, in his Statement of Additional Facts, backtracked from his testimony that he did not receive any injuries. Pl.'s SOAF ¶ 11. Plaintiff states that "didn't feel comfortable discussing" it, but he was injured in both incidents. *Id.* Plaintiff contends he received scratches on July 7, 2018, and a busted lip on July 29, 2018. *Id.* Plaintiff also states that he feared such incidents could happen again. *Id.*

Sgt. Moffett reviewed certain Classification records, including Incident Reports # 2018-2425 and #2018-2720, a Classification Alert (#1835) written by Deputy James Demasi regarding a fight between Plaintiff and Smith. Defs.' SOF ¶ 24. These records are kept in the ordinary course of business, and Sgt. Moffett relied on them in preparing her affidavit. *Id.* Regarding security issues that can arise between detainees, Sgt. Moffett would receive a "Classification Alert" when detainees who are housed together got into a physical fight, not in instances of verbal or non-physical harassment. *Id.*; *see* R. 109-3, Moffett Aff. ¶ 8.

In instances of physical fights, a "keep separate" designation would then be documented in the detainees' classification files and placed on the pod roster for the housing unit in which the detainees were placed. Defs.' SOF ¶ 26.[4] The only Classification Alert between Plaintiff and Smith was sent to Classifications on July 7, 2018. *Id.* ¶ 27. The Classification Alert indicated that the two were to be kept separate. *See* R 109-3 at 5. Prior to that, Sgt. Moffett contends, there was no indication that Plaintiff and Smith needed to be kept separately. *See* Defs.' SOF ¶ 27.

---

[4]Plaintiff contends, although without citation to the record, that he had "keep separate" orders from several other inmates over incidents that did not involve physical contact. *See* Pl.'s SOAF ¶¶ 2–3.

Sgt. Moffett averred that in reviewing Incident Report 2018-2720, Deputy Patras "did not find" the keep separate order until after the altercation occurred on July 29, 2018 and allowed both detainees out of their cells in the Administrative Segregation Unit at the same time. *Id.* at ¶ 28; *see* Moffett Aff. ¶ 11.[5]

Sgt. Moffett was not present in the Administrative Segregation Unit on either July 7, 2018 or July 29, 2018, and she did not know that Deputy Patras would not see the keep separate designation. Defs.' SOF ¶ 29. Sgt. Moffett did not make decisions with respect to specific housing assignments in the Administrative Segregation Unit or when the inmates would receive time out of their cells. *Id.* ¶ 30.[6]

Sgt. Moffett is familiar with the grievance procedure at the WCADF, which requires detainees to fill out an Inmate Request Form, or Form 22, to make specific requests or to file a grievance. Defs.' SOF ¶ 31; *see* Moffett Aff. ¶¶ 15–17. Detainees are required to file a Form 22 within 48 hours of the alleged misconduct and submit it to the housing officer, who would then forward it to Classification. Defs.' SOF ¶ 32. The Classification Sergeant or designee would then review the grievance and respond or refer the grievance to a particular department head responsible for that area. *Id.* ¶ 33. Staff responses are to be made within 15 days, unless circumstances require an extension. *Id.*

---

[5]Deputy Patras, in this incident report, stated that he reviewed the pod roster before opening the cell doors, and Plaintiff and Smith were not designated to be kept separate. After the incident, Deputy Talbert found a keep separate designation for the two listed in what he described as a "keep separate archived report." The pod roster was updated to reflect this. *See* R. 109-3 at 11, Incident Report 2018-2720.

[6]Plaintiff states, without citation to the record, that Sgt. Moffett, "classified or helped classify us detainees and decided appropriate housing assignments." Pl.'s SOAF ¶ 10.

After receipt of a response, the detainee has 48 hours to file an appeal on the Form 22 and submit it to the housing unit officer. Defs.' SOF ¶ 34. Detainees are allowed one level of appeal. *Id.* If an appeal is filed, Sgt. Moffett may respond to it within 15 days, or it may be sent to the Deputy Chief of Operations or Support Services, depending on the nature of the grievance. *Id.* ¶ 35.

Sgt. Moffett reviewed Plaintiff's Classification file and found two Form 22s filed by Plaintiff on June 10, 2018 regarding Plaintiff's claim that Smith urinated on his chuckhole, as well as Sgt. Chester's review and response to Plaintiff. Defs.' SOF ¶ 36; *see* Moffett Aff. ¶ 26.[7] Williams did not write that Smith had physical contact with him or otherwise threatened injury on June 10, 2018, and as such Sgt. Moffett averred that the nature of the incident would not have resulted in a keep separate designation between the two. Defs.' SOF ¶ 37.

Deputy Chief Taylor has served as the Chief of Operations at the WCADF since 2014. Defs.' SOF ¶ 38. His primary responsibility in that role is ensuring the safety and security of the facility, including corrections and civilian staff, detainees, and visitors. *Id.* As part of his administrative duties, Deputy Chief Taylor is responsible for hiring, discipline, and termination of deputies and command staff. *Id.* ¶ 39. He also reviews all detainee disciplinary packets. *Id.*

Further, Deputy Chief Taylor makes decisions with respect to any heightened security protocols necessary for "high risk" detainees moving through or outside the facility. Defs.' SOF ¶ 40. Such decisions are based on detainees' disciplinary history

---

[7]It appears from a review of the Form 22s that Plaintiff attempted to file one as an emergency grievance, but that officers responded to the grievances jointly. (*See* R. 109-3, at 15–16.

and past aggressive or combative behavior. *Id.* Plaintiff was on a "high-risk" protocol at the time of the incident. Pl.'s SOAF ¶¶ 15, 19. Deputy Chief Taylor does not make day-to-day decisions regarding detainee housing, nor does he get involved in handling Classification Alerts or keep separate designations, which are delegated to Classification and Housing Command staff. Defs.' SOF ¶ 41. Plaintiff contends that because he was on "high-risk" protocol, Deputy Chief Taylor did make day-to-day decisions concerning him, but he points to no evidence in the record. Pl.'s SOAF ¶¶ 16, 20.

Deputy Chief Taylor reviewed several Classification records relevant to the events complained of, including the July 7, 2018 Classification Alert, Incident Report #2018-2425 (concerning the July 7, 2018 incident between Smith and Plaintiff), Incident Report 2018-2720 (concerning the July 29, 2018 incident), Plaintiff's June 10, 2018, grievances and a grievance he filed July 14, 2018. Defs.' SOF ¶ 42. Deputy Chief Taylor attested that these are business records kept and maintained by the WCADF in the ordinary course of its business. *See* R. 109-4, Taylor Aff. ¶ 8.

Upon his review of these documents, Deputy Chief Taylor averred that no keep separate order would have been entered as a result of the June 10, 2018, incident (in which Plaintiff complained that Smith urinated on his chuckhole) because there was no physical contact and Plaintiff did not state that he feared for his safety or that Smith threatened him with physical harm. Defs.' SOF ¶ 43. The keep separate designation went into effect on July 7, 2018, after Plaintiff and Smith had a physical fight, although neither was injured. *Id.* ¶ 44.

11

Deputy Chief Taylor was not present in the Administrative Segregation Unit on either July 7 or July 29, 2018, and he was not involved in allowing Plaintiff and Smith out of their cells at the same time, nor did Deputy Patras do so at his direction. Defs.' SOF ¶ 45. The only grievance Plaintiff filed about Deputy Chief Taylor's actions was with respect to the high-risk security protocols that were put in place regarding Plaintiff's movement within and outside the facility. *Id.* ¶ 46.

### 2. Facts as to Alleged Inadequate Diet

Plaintiff testified that he believed the calorie count of the food served at the jail to be below 1,800 based on his observations of the food, including that he was sometimes served one piece of bread and grits for breakfast. Defs.' SOF ¶ 19. Sgt. Moffett, who served as the Classification Sergeant from 2014 through 2019, reviewed and responded to detainee grievances and requests. *Id.* ¶¶ 20–21. Grievances or requests directed at Food Services would be forwarded to Supervisor Randi Slater for a response. *Id.* ¶ 22. At no relevant time did Sgt. Moffett have any direct control over Food Services, which falls under the supervision of Dave Adams, deputy chief of support services. *Id.* ¶ 23.

Randi Slater has been employed as the Food Services Supervisor at the WCADF since 2013. Defs.' SOF ¶ 47. Most food is prepared in-house, and Slater is responsible for planning daily menus, which include at least three meals a day, to ensure that the 700 to 800 detainees at the facility are provided food of sufficient nutritional value with a minimum of 1,800 to 2,000 calories a day. *Id.* Slater also is responsible for planning daily menus for adult detainees with special dietary

restrictions for medical or religious reasons, including menus for detainees following a vegetarian, Kosher, or other religious diet. *Id.* ¶ 48.

Prior to any menu being put in place, Slater submits the proposed menus on a monthly and biyearly basis to Jeannine Humphrey, a registered, licensed dietician hired by the Will County Sheriff's Office. Defs.' SOF ¶ 49. The menu plans are over a week-long period, have four cycles, and are planned for the entire month. *Id.* ¶ 50. Substitutions are made as necessary based on the availability of food products and local donations. *Id.* Slater also submits main kitchen meal logs to Humphrey for review and approval; these logs note the actual meal items that are served as substitutions. *Id.* ¶ 51.

Humphrey analyzes the meal plans and logs using a software program called ESHA's Food Processor Nutrition Analysis, which is a well-recognized tool in the field of nutrition, and which provides a detailed breakdown of the nutritional and caloric content of the meals served at the WCADF. Defs.' SOF ¶ 52. The program helps determine whether the food provided meets the 1,800- to 2,000-caloric range for detainees. *Id.* ¶ 53. Typically, the meals provided either meet or exceed the requirement and are in the range of 2,100 to 2,500 per day. *Id.*[8]

Plaintiff, contends, without citation to any evidence, that the planned meals were rarely served, meals did not come with ingredient labels, and that Defendants

---

[8]Humphrey's affidavit further indicates that the menu analyses she provided to the WCADF from September 2017 through December 2018 confirmed that the meals from this time period met, and most often exceeded, nutritional and caloric standards as set by Illinois Jail Standards. *See* R. 109-6, Humphrey Aff. ¶ 10.

13

cannot prove that the hot dogs and donated foods were pork-free. He also disputes the adequacy of Defendants' evidence. *See* Pl.'s SOAF ¶¶ 28–34.

Slater averred that Plaintiff never filed a grievance alleging an insufficient caloric count of his meals, that the food made him sick or was inedible, or that he was losing weight. Defs.' SOF ¶ 58. Plaintiff filed grievances about alleged tampering by pod workers or tender workers (apparently kitchen workers, although this is not clear), missing chips or desserts, meat substitutions, no beans, and a desire to be removed from the Kosher diet as a "reverted" Muslim. *Id.* Slater informed Plaintiff that pod workers and tenders are supervised during meal service, a missing doughnut at lunch was an oversight, he had been removed from the Kosher diet at his request, and meal plans are fluid by nature and can change based on available donations and food products. *Id.* ¶ 59. Plaintiff indicates in his Statement of Additional Facts that he filed additional grievances about the meals at the facility in July 2018 that were not included Defendants' motion, although he does not provide copies of any such grievances. Pl.'s SOAF ¶¶ 8, 35. Plaintiff further contends his grievances as to dietary and other issues are "manipulated," although he does not cite to the record. *Id.* ¶ 9. He contends that certain of his grievances were not given a grievance number, also without citation to the record. *Id.* ¶ 14.

### 3. Facts as to Alleged Denial of Kosher Food Tray

Plaintiff alleges that Deacon John Shea deprived him of a Kosher tray. Defs.' SOF ¶ 16. Plaintiff also contends that he was served hot dogs and salami at the jail that were not pork-free. *Id.* ¶ 17. Since 2013, according to Slater, the WCADF has

14

been a pork-free facility; all of the hot dogs and salami that are part of detainee meal plans are made of turkey. *Id.* ¶ 54. If a detainee wants a religious dietary accommodation, he must submit a request in writing to Classifications. *Id.* ¶ 55. That request is then forwarded to the Center for Correctional Concerns (CCC) for approval. *Id.* Slater does not make the decision as to which detainee receives a specific diet. *Id.* Slater also does not take a detainee off a religious diet unless advised to do so by CCC. *Id.* ¶ 56. On December 12, 2017, Deacon Shea sent Slater an internal memo indicating that Plaintiff wanted to be put back on a standard diet, rather than a Kosher diet. *Id.* ¶ 57. Slater made the notation in the menu plan moving forward. *Id.*

Plaintiff, a Muslim, requested Kosher meals after he came to the WCADF. *See* R. 109-1, Pl.'s Dep. at 21:2, 22:15–17. Plaintiff testified that he did not recall asking to be taken off Kosher meals on December 12, 2017. Defs.' SOF ¶ 18. In his Statement of Additional Facts, however, Plaintiff acknowledges doing so. Pl.'s SOAF ¶ 37 ("I had reasoning for being taken off kosher/halal diet."). Plaintiff explains that he was "paranoid" that authorities would "unjustly deal[]" with his meals, by which he apparently means that he was afraid that officers or pod workers would tamper with them. *Id.* At some point after being taken off Kosher meals, Plaintiff made multiple requests to receive Kosher meals again. Defs.' SOF ¶ 18. Plaintiff contends that he was not "on again, off again" with his requests, and states that he did not receive a Kosher meal for the remainder of his stay at the WCADF. Pl.'s SOAF ¶ 38.

Deacon Shea is an ordained deacon with the Catholic Church and is presently assigned to the Cathedral of Saint Raymond in Joliet. Defs.' SOF ¶ 60. He is not an

employee of the WCADF but has served as the facility chaplain and director of pastoral services at the facility through CCC since February 2014. *Id.* In that position, Deacon Shea assists the administration with determining whether a detainee has a sincerely held belief in his faith such that the detainee has a legitimate basis for requesting a religious accommodation for his diet. *Id.* ¶ 61.

At intake to the WCADF, detainees are asked if they have a religious preference. Defs.' SOF ¶ 62. Detainees who state they are Muslim do not automatically receive a Kosher diet but must submit a Form 22 making a request for dietary accommodation. *Id.* The Form 22 goes to Deacon Shea for review. *Id.* ¶ 63. He then reviews the intake records or Inmate Activity Log to determine the stated religious preference of the detainee, and if it is Muslim, Deacon Shea recommends that the request be approved. *Id.*

If the detainee then asks Food Services to be removed from the Kosher meal plan, the Form 22 would be forwarded to Deacon Shea, who notifies Food Services of the request and recommends that it be followed. Defs.' SOF ¶ 64. A second request to go back on a Kosher meal plan is not recommended, as Deacon Shea believes at that point that the detainee's religious beliefs or practices likely are not firmly and sincerely held. *Id.* ¶ 65.

Plaintiff requested a Kosher meal accommodation on November 30, 2017 and asked to be taken of Kosher meals on December 12, 2017. Defs.' SOF ¶ 66. Deacon Shea approved both requests. *Id.* Several of Plaintiff's religious requests were initially denied because Plaintiff used the wrong inmate number. *Id.* ¶ 67. On

16

February 26, 2018, when Plaintiff again requested a Kosher diet, Deacon Shea denied the request because "I do not approve a second request once the detainee has elected to forego a specific religious diet." *See* R. 109-2, Shea Aff. ¶ 16.

## II. Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of fact exists. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). The Court must construe all facts in the light most favorable to the nonmoving party and resolve all doubts in favor of that party. *Id.* Regarding exhaustion, a hearing under *Pavey v. Conley* (*Pavey I*), 544 F.3d 739, 741–42 (7th Cir. 2008) is necessary only when there are disputed issues of fact that require further inquiry.

Material facts are determined by the substantive law underlying the claim, and a genuine issue is one that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Disputes about irrelevant or unnecessary facts do not count. *Id.* Summary judgment is warranted where a party fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party bears the burden of proof at trial. *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing

17

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The moving party may discharge its burden by demonstrating the absence of evidence to support the non-moving party's case. *Celotex Corp.,* 477 U.S. at 325.

### III. Analysis

### A. Failure to Protect

The constitutional rights of pretrial detainees are protected by the Fourteenth Amendment, which means that pretrial detainees are entitled to be free from conditions that amount to punishment. *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015). All types of conditions of confinement claims are decided under an objective reasonableness standard. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019). In *Miranda v. Cty. of Lake*, 900 F.3d 335, 353–54 (7th Cir. 2018), the Seventh Circuit cited with approval a Ninth Circuit case, *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016), setting forth a four-pronged test for failure to protect claims. The test requires the plaintiff to show: "(1) [t]he defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) [t]hose conditions put the plaintiff at substantial risk of suffering serious harm;" (3) the defendant's conduct was objectively unreasonable (*i.e.*, the officer "did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious"); and "(4) [b]y not taking such measures, the defendant caused the plaintiff's injuries." *Castro*, 833 F.3d at 1071.

18

A constitutional violation does not occur every time an inmate is attacked in a correctional facility. *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Correctional facilities, "after all, are dangerous places often full of people who have demonstrated aggression." *Id.*; *see also Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004) ("[P]risons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more."). Negligence by correctional officials is not enough to establish liability. *See Miranda*, 900 F.3d at 353–54 (detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard") (internal citations omitted).

Plaintiff asserts a failure to protect claim as to both the July 7, 2018 and July 29, 2018, incidents with Smith against both Deputy Chief Taylor and Sgt. Moffett.

## 1. Deputy Chief Taylor

Plaintiff has not brought forth evidence that Deputy Chief Taylor was personally involved in either incident. In § 1983 lawsuits, government officials are responsible only for their own misconduct. *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). This means that to recover damages from a prison official in a supervisory role, a plaintiff may not rely on a theory of supervisory liability, but must instead allege that the defendant, through his own conduct, violated the Constitution. *Id.* A supervisor who does not directly participate in the alleged misconduct can be liable if he "directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (internal citation and quotation omitted). This means that the official knew about the

complained-of conduct and facilitated, approved, or condoned it, or turned a blind eye to it. *Id.*; *see Chavez v. Ill. State Police,* 251 F.3d 612, 651 (7th Cir. 2001) ("[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable . . . .") (internal citation and quotation omitted).

The undisputed evidence is that Deputy Chief Taylor did not make day-to-day decisions regarding detainee housing, nor was he involved in handling Classification Alerts or keep separate designations. Plaintiff speculates that because he was on "high-risk" protocol, Deputy Chief Taylor did make day-to-day decisions concerning his housing, but he offers no evidence in support of this and the record contains none. Rather, Deputy Chief Taylor explained that the "high-risk" protocol involved heightened security protocols for certain high-risk detainees moving within or outside the facility. There is no evidence that Deputy Chief Taylor was involved in, or even aware of, the housing assignments or decisions that led to the July 7, 2018 and July 29, 2018, confrontations between Smith and Plaintiff. Therefore, he is entitled to summary judgment on Plaintiff's failure to protect claims.

### 2. Sgt. Moffett

The Court next considers Plaintiff's failure to protect claims as to Sgt. Moffett. In regard to the July 7, 2018, incident, Plaintiff seems to argue that it should not have occurred because a keep separate order should have been put in place between him and Smith after the incident in which Smith allegedly urinated on Plaintiff's chuckhole. Defendants maintain that under jail policies, a keep separate order would

not have been generated as a result of the incident because the incident did not involve physical contact or a threat of injury.

Plaintiff's June 10, 2018, grievance documents state that Plaintiff had informed two deputies about an inmate "exposing himself" and "situating himself" near his chuckhole, but the deputies did not take him seriously. *See* R. 109-3 at 15. Plaintiff stated that Smith latter bragged about urinating on his chuckhole. *Id.* at 16. The grievance response indicated that one of the deputies, Deputy DiTello, saw Smith near Plaintiff's cell but did not see any foreign substances on or near the chuckhole. *Id.* at 15. The response further indicated that upon review of video and audio footage, the inmates "antagonized each other with words." *Id.* Plaintiff and Smith were separated into different dayrooms to prevent further incidents. *Id.*

In order for Sgt. Moffett to be liable for any failure to protect in regard to the July 7, 2018, incident, Plaintiff must come forth with evidence that a reasonable officer in her shoes would have appreciated a high degree of risk to Plaintiff should she fail to put a keep separate order in place as a result of Plaintiff's complaint about Smith's alleged urination on his chuckhole. *See Castro*, 833 F.3d at 1071 (quoting Restatement (Second) of Torts § 500 cmt. a (Am. Law Inst. 2016) (recognizing that "reckless disregard" may be shown by an objective standard under which an individual "is held to the realization of the aggravated risk which a reasonable [person] in his place would have, although he does not himself have it")).

Reading the June 10, 2018 grievance documents in the light most favorable to Plaintiff, they would not have put a reasonable officer on notice of a risk of serious

harm to Plaintiff. Plaintiff did not describe any threats made by Smith, nor did he request a keep separate order. To implicate the Constitution, a correctional official must have enough information to suggest an objectively serious risk to the complaining detainee's safety from another inmate. *Thompson v. Modreno*, 2020 WL 4819266, at *4 (N.D. Ill. Aug. 17, 2020) (Durkin, J.); *see Rodriguez v. Goins*, 2020 WL 6150984, at *4 (N.D.N.Y. Aug. 17, 2020) (Stewart, M.J.), *report and recommendation adopted,* 2020 WL 6146597 (N.D.N.Y. Oct. 20, 2020) ("In order for a corrections officer to be held liable for failing to protect an inmate from another inmate, the corrections officer must have been aware of a 'clear and specific threat' of harm to that inmate.").

In this regard, jail officials are generally put on notice of a risk of harm when an inmate articulates a specific threat to his safety. *See Johnson v. Taylor*, 2020 WL 5891401, at *2 (N.D. Ill. Oct. 5, 2020) (Feinerman, J.) (citing *Gevas v. McLaughlin*, 798 F.3d 475, 480–82 (7th Cir. 2015) ("In failure to protect cases, [a] prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety.")). Plaintiff's complaint about Smith urinating on or near his chuckhole, while obviously unpleasant, did not communicate a heightened risk of serious harm. *See Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir. 2008) (plaintiff's complaint that he wanted a transfer because he feared for his life was insufficient to put officers on notice of risk of serious harm because he did not state that he was threatened with future violence or explain why he had been targeted by other prisoners).

Plaintiff argues that he had keep separate orders from other inmates "that did not involve nor indicate any physical contact/harm or threat." *See* Pl.'s SOAF ¶ 2. But Plaintiff does not attach these keep separate orders nor does he present any evidence about the circumstances in which these keep separate orders were entered, and regardless, the question in this case is whether Sgt. Moffett recklessly disregarded a serious risk of harm to Plaintiff prior to the July 7, 2018 incident. There is no evidence in the record that she did. For this reason, summary judgment is granted in Sgt. Moffett's favor as to Plaintiff's failure to protect claim in regard to the July 7, 2018 incident.

Next, as to the July 29, 2018 confrontation between Plaintiff and Smith, Defendant Moffett argues: (1) no reasonable officer would have appreciated a heightened risk of serious harm because Plaintiff had not been injured in the July 7, 2018 incident; (2) there is no evidence that she was physically present in the unit at the time of this incident; (3) there was no reason for her to know that Deputy Patras would fail to note the keep separate alert on the pod roster; and (4) Plaintiff had the opportunity to avoid the confrontation with Smith because he saw Smith coming up the stairs to the upper tier while Plaintiff was still at his cell door. *See* Defs.' Memo. Summ. J. at 6.

As to the first point, by the time of the July 29, 2018 incident, Sgt. Moffett had put a keep separate order in place between Smith and Plaintiff as a result of a physical fight. This is some evidence that a reasonable officer would have appreciated a heightened risk of serious harm to Plaintiff. *See Ruiz v. Westchester Cty.*, 2020 WL

23

4340788, at *6 (S.D.N.Y. July 28, 2020) (Karas, J.) (collecting cases holding that no-contact orders between inmates indicate the existence of a substantial risk of serious harm). This, however, leads to Defendant's next argument, that Sgt. Moffett was not present at the time of the July 29, 2018 incident and that any risk should have been eliminated by Sgt. Moffett's reasonable action of putting the keep separate order in place.

The problem is that it is unclear whether the keep separate order was properly put into place. The incident report from Deputy Patras that Sgt. Moffett relied upon in asserting that Deputy Patras "did not find" the keep separate order states that there was no keep separate alert on the pod roster. Defs.' SOF ¶ 28; R. 109-3, Moffet Aff. ¶ 11. Deputy Patras further stated that Deputy Talbert later found a keep separate alert for the two in the "keep separate archived report," and the pod roster was updated to reflect this. *See* R 109-3, at 11, 2018-2720 Incident Report. Assuming this version of events is correct, it is not clear from the report, or from the record as a whole, who was responsible for updating the pod roster, why it was not updated prior to the incident, or whether the failure to do so amounted to negligence or something more.

Next, while Defendants argue that Plaintiff could have avoided the fight with Smith by going back to his cell, the record is unclear as to this point. Plaintiff testified that he was coming out of his cell at the time of the incident, and that when he saw Smith "he was already so close to me that, you know, it was either fight or try and run into the cell or, you know, either way it went. It looked like either way, it was

24

going to be a physical altercation." R. 109-1, Pl.'s Dep. at 16:3–9. There is support in the caselaw for the proposition that a plaintiff cannot recover for failure to protect when he could have avoided the physical confrontation. *See, e.g.*, *Lemmons v. Durant*, 2011 WL 4633104, at *3 (C.D. Ill. Oct. 4, 2011) (Baker, J.) (plaintiff could not recover where "he clearly could have avoided the situation by staying in his room or contacting staff"); *see also Sellers v. Steyth*, 2015 WL 6455565, at *4 (D. Mont. Oct. 26, 2015) (Molloy, J.) (collecting cases dismissing failure to protect claims where plaintiff instigated or could have avoided fight). But in this instance, it is unclear whether Plaintiff could have avoided the fight by going back into his cell, and in particular whether he had enough time to get into the cell and lock the door before Smith was upon him. Plaintiff's testimony was ambiguous on this point, particularly in light of his comment that "[i]t looked like either way, it was going to be a physical altercation."

Defendants also point out that Plaintiff testified that he suffered no injuries in regard to either altercation with Smith, although he attempts in his response to backtrack from this testimony in his response. However, the lack of an injury does not doom Plaintiff's claim. *See Wright v. Miller*, 561 F. App'x. 551, 555 (7th Cir. 2014) ("Even without an actual injury, the mere probability of the harm . . . can be sufficient to create liability."). But if Plaintiff suffered no physical injury, he may seek only nominal or punitive damages, if appropriate. *Id.*; *see* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without

a prior showing of physical injury . . . . "); *see also Calhoun v. DeTella*, 319 F.3d 936, 942 (7th Cir. 2003) (Section 1997e(e) did not bar claim Eighth Amendment claim for nominal and punitive damages even in the absence of a physical injury).

With all this said, there are questions of fact about why the keep separate order was not enforced as to Plaintiff and Smith on July 29, 2018, and who was responsible for that lack of enforcement. The Court cannot find for Sgt. Moffett as a matter of law on the record before it.

### 3.  Failure to Exhaust Administrative Remedies

Defendants argue in the alternative that they are entitled to judgment as a matter of law because Plaintiff failed to exhaust his administrative remedies. But the record is unclear on this point as well.

Defendants contend that Plaintiff's June 10, 2018 grievances concerning Smith having allegedly urinated on Plaintiff's chuckhole do not identify Sgt. Moffett or Deputy Chief Taylor or accuse them of any misconduct. *See* Defs.' Memo. Summ. J. at 13. They further argue that the only grievance Plaintiff filed as to Deputy Chief Taylor's conduct concerned the high-risk security protocols, relying on Deputy Chief Taylor's assertion in his affidavit that, to the best of his recollection, Plaintiff did not file a grievance against him regarding the altercations with Smith and only filed a grievance against him about the high-risk security protocols. *Id.*; *see* R. 109–4, Taylor Aff. ¶¶ 12–13.

In order to determine whether Plaintiff exhausted his administrative remedies as to these claims, the key question is whether Plaintiff filed any grievances or

appeals as to the July 7 and July 29 incidents, and what he said in those grievances. It is unclear from Sgt. Moffett and Deputy Chief Taylor's affidavits—and the record as a whole—whether anyone reviewed Plaintiff's grievance file to determine whether he filed grievances as to the July 7 and July 29, 2018 incidents. Defendants' argument that Plaintiff did not name them in his June 10, 2018 grievances is irrelevant, as Plaintiff does not allege a failure to protect as to that incident. Because the record does not support a finding that Plaintiff failed to exhaust his administrative remedies as to his failure-to-protect claims, judgment on this basis is denied.

In sum, summary judgment is granted for Defendant Taylor as to Plaintiff's failure to protect claims for lack of personal involvement. Summary judgment is granted for Sgt. Moffett as to the July 7, 2018 incident, but denied as to the July 29, 2018 incident.

## B.    Inadequate Diet

Under the Fourteenth Amendment, detainees are entitled to confinement under humane conditions that satisfy "basic human needs." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012). This includes "'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.'" *Todd v. Dart*, 2010 WL 4448043, at *6 (N.D. Ill. Oct. 25, 2010) (St. Eve, J.) (quoting *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985)). While an inmate is not entitled to the diet of his choice, an extended period in which an inmate receives inadequate nutrition amounts to a constitutional violation. *See Widmer v. Hodge*, 2015 WL

27

1884329, at *4 (S.D. Ill. April 24, 2015) (Williams, M.J.) (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996)). The relevant inquiry is whether the defendants' knowing or purposeful actions in regard to the detainee's diet were objectively unreasonable. *See Hardeman*, 933 F.3d at 822–23; *Miranda*, 900 F.3d at 353–54.

### 1. Sgt. Moffett

First, as discussed above in regard to Plaintiff's failure to protect claim, liability under the Civil Rights Act requires a defendant's personal involvement in the alleged constitutional violation. *See Perez*, 792 F.3d at 781. The undisputed evidence is that Sgt. Moffett was not personally involved with meal planning or preparation and did not have any direct control over Food Services. Defs.' SOF ¶ 23. Therefore, she is entitled to summary judgment on this claim.

### 2. Slater

Next, although Plaintiff's allegations were sufficient to survive screening review, he has not come forward with any evidence that he was consistently served meals with insufficient calories to maintain health. Humphrey, a licensed dietician, reviewed both the proposed menus and the main kitchen meal logs (which showed actual items served) and approved them as having sufficient caloric and nutritional content for the detainee population. Defs.' SOF ¶¶ 49–53. In such circumstances, courts have found summary judgment appropriate. *See, e.g., Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) (prisoners' claim of inadequate diet failed in light of affidavit from food services director that the meals were in compliance with guidelines set by a dietician); *Robeson v. Squadrito*, 57 F. Supp. 2d 642, 648 (N.D.

Ind. 1999) (detainee's lay opinion that jail servings were too small did not raise a genuine issue of fact for trial in light of evidence from licensed dietician that meals met caloric and nutritional standards); *Becerra v. Kramer*, 2017 WL 85447, at *6 (N.D. Ill. Jan. 10, 2017) (St. Eve, J.) (claim that jail diet was nutritionally inadequate failed in light of uncontested evidence that a certified dietician planned the meals to ensure they met nutritional requirements). For these reasons, summary judgment is granted as to Defendant Slater on this claim.[9]

### C. Religious Diet Claims

The Court's screening order allowed Plaintiff to proceed on his allegations that he had been denied a Kosher diet and was served pork products in violation of his religious beliefs. Correctional facilities must permit inmates the reasonable opportunity to exercise religious freedom. *Maddox v. Love*, 655 F.3d 709, 719 (7th Cir. 2011). Both the Free Exercise Clause of the First Amendment and RLUIPA protect an inmate's right to practice his religion. *Oliver v. Harner*, 2016 WL 1117084, at *7 (S.D. Ill. Mar. 22, 2016) (Rosenstengel, J.). The Free Exercise Clause prohibits the state from imposing "a substantial burden" on a "central religious belief or practice" unless the burden is reasonably related to a legitimate penological interest. *Id.* (citing *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013)). RLUIPA, which applies to programs that receive federal financial assistance (like correctional facilities),

---

[9]Defendants also argue that Plaintiff failed to exhaust his administrative remedies as to this claim. As to this point, Plaintiff contends that he filed additional grievances regarding his diet that were not included in the summary judgment materials. *See* Pl.'s SOAF ¶¶ 8, 35. The Court declines to decide this issue given that Plaintiff's dietary claim clearly fails on the merits.

provides that the government may not impose a "substantial burden" on an inmate's religious exercise unless the burden is the "least restrictive means" of furthering a "compelling governmental interest." *Id.* (citing 42 U.S.C. § 2000cc–1(a)(1)–(2)). To prevail on either type of claim, an inmate must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016)*; see also Koger v. Bryan*, 523 F.3d 789, 796–97 (7th Cir. 2008).

### 1. Sgt. Moffett

First, as discussed above, the record is undisputed that Sgt. Moffett did not have any control over Food Services. Defs.' SOF ¶ 23. Rather, Deacon Shea made the decisions as to Plaintiff's religious diet request. *Id.* ¶¶ 60–63. "Under any theory, to be liable under § 1983, the individual defendant must have 'caused or participated in a constitutional deprivation.'" *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (internal citation and quotation omitted). As she was not personally involved in the alleged violations of Plaintiff's religious rights, Sgt. Moffett cannot be held liable for any violation of Plaintiff's religious rights.

### 2. Slater

The undisputed evidence also shows that Slater did not make the decision as to what detainees received religious diets or whether they should be taken off those diets. Defs.' SOF ¶ 55. She therefore is entitled to summary judgment on that aspect of Plaintiff's claim for lack of personal involvement.

Next, as to Plaintiff's allegation that he was served pork products, the undisputed evidence is that the WCADF has been a pork-free facility since 2013, and that all hot dogs and salami served to detainees are made of turkey. Defs.' SOF ¶ 54. Plaintiff disputes this but has brought forth no evidence that he was served pork at any time. Plaintiff's speculation otherwise is not sufficient to defeat summary judgment. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (courts "are not required to draw every conceivable inference from the record," and "mere speculation or conjecture" will not defeat summary judgment). Consequently, Slater also is entitled to summary judgment as to Plaintiff's claim that he was served pork products.

### 3.  Deacon Shea

As to Plaintiff's claim against Deacon Shea regarding his religious diet, Defendant Shea argues only that Plaintiff's religious beliefs were not sincerely held. Defs.' Memo. Summ. J. at 10–11. He does not address whether the decision to deny him Kosher meals substantially burdened Plaintiff's right to practice his religion or was reasonably related to legitimate penological interests. Deacon Shea points to the fact that Plaintiff "reversed course" and requested to be taken off a Kosher diet two weeks after he originally requested it. *Id.* at 11. And he points to a grievance in the record where Plaintiff referred to himself as a "reverted Muslim" and in which he contends Plaintiff indicated that he could eat pork. *Id.* at 10–11.

The grievance in question, dated October 28, 2017, is difficult to read. *See* R. 109-5 at 11. It is unclear what Plaintiff meant by calling himself a reverted Muslim

and whether he was requesting to eat pork, as one portion of the grievance appears to refer to pork-free meals. *Id.* Defendant Shea also argues that a chaplain may refuse a request made for reasons other than religious belief, and that a chaplain may permissibly consider "the frequency or pattern of requested changes." Defs.' Memo. Summ. J. at 11 (citing *Ruiz v. Adamson*, 2012 WL 832986, at *1 (N.D. Ill. Mar. 8, 2012) (Hibbler, J.) (citing 20 Ill. Admin. Code § 425.30(h) (in deciding whether to allow committed person to change their designated religious affiliation, a facility chaplain may consider "the frequency of changes or a pattern of changing religious affiliation prior to a particular faith group's scheduled holiday or celebration"))).

After refusing to admit in his deposition testimony that he ever requested to be taken off Kosher meals, Plaintiff did so in his response, admitting that he made the request because he was "paranoid" that someone would tamper with his meals. Pl.'s SOAF ¶ 37. Plaintiff's Inmate Activity Log indicates that he claimed to be of unsound mind during the period in which he requested to be taken off Kosher meals, but Deacon Shea responded that his behavior was consistent with his typical interactions with CCC and refused his request to again receive a Kosher diet. *See* R. 109-2 at 15, 5/15/2018 Entry. The Inmate Activity Log indicates that after being taken off Kosher meals on December 12, 2017, Plaintiff made multiple requests to again receive a religious diet that were denied, with notations that Plaintiff was told that no further dietary changes would be approved. *See id.* at 11–15, 2/26/2018, 3/12/2018, 3/21/2018, 4/30/2018, 5/1/2018, 5/15/2018 Entries. Plaintiff contends that his multiple requests to be placed back on a Kosher diet show that he was sincere in

32

his beliefs, and that this was not a situation in which he was "on-again, off-again" with his meal requests. Pl.'s SOAF ¶¶ 39–40; Pl.'s Resp. Memo. Summ. J. at 2.

"[T]he Free Exercise Clause does not protect requests which are not sincerely held." *Williams v. Miller*, 2007 WL 2893641, at *4 (S.D. Ill. Sept. 28, 2007) (Reagan, J.); *see Vinning-El v. Evans*, 657 F.3d 591, 593–94 (7th Cir. 2011) ("Sincere religious beliefs must be accommodated . . . but non-religious beliefs need not be."). Similarly, RLUIPA "is a guarantor of sincerely held religious beliefs." *See Koger*, 523 F.3d at 797. "A prison is entitled to ensure that a given claim reflects a sincere religious belief, rather than a preference for the way a given diet tastes, a belief that the preferred diet is less painful for animals, or a prisoner's desire to make a pest of himself and cause trouble for his captors." *Vinning-El*, 657 F.3d at 594.

Here, there is conflicting evidence as to the sincerity of Plaintiff's beliefs. Deacon Shea points to the fact that Plaintiff requested a Kosher meal accommodation on November 30, 2017 and changed his mind less than two weeks later. Plaintiff points to his repeated requests to be put back on a Kosher diet as evidence of his sincerity. He testified that after he was taken off the Kosher diet, he requested to be put back on multiple times but those requests were denied and he did not receive Kosher meals from December 2017 through the time he left the facility in October 2018. *See* Pl.'s Dep. at 26:15–27:4.

Inconsistencies in professed beliefs may be evidence of insincerity. *See Schlemm v. Wall*, 165 F. Supp. 3d 751, 760 (W.D. Wis. 2016) (citing *Lindell v. Casperson*, 360 F. Supp. 2d 932, 952–53 (W.D. Wis. 2005), *aff'd sub nom. Lindell v.*

33

*Govier*, 169 F. App'x. 999 (7th Cir. 2006) ("inconsistent and ever-changing" requests for particular items and food undermined plaintiff's claim of sincerely held religious beliefs)). By contrast, repeated requests for an accommodation over a long period of time indicates that a belief was sincerely held. *See Oliver*, 2016 WL 1117084, at *9 (duration of time over which plaintiff sought to have his request for a religious diet accommodated indicated that his beliefs were sincerely held) (citing *Koger*, 523 F.3d at 797)). Further, the Seventh Circuit has cautioned that "a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?" *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012).

When a claim turns on a factual evaluation of whether a religious belief is sincere, summary judgment is inappropriate. *See Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004) (whether a religious belief is sincerely held is a factual determination, "so we must not quickly dismiss such claims on summary judgment by concluding those beliefs are not genuine"); *Rogers v. Dart*, 2015 WL 1298636, at *6 (N.D. Ill. Mar. 19, 2015) (Coleman, J) (question of fact existed as to sincerity of inmate's religious beliefs where he purchased products from commissary that conflicted with his religious diet, but explained that his beliefs were sincere although he struggled with some of the teachings); *Williams*, 2007 WL 2893641, at *4 ("Whether a religious belief is sincere is a question of fact best left to a jury to resolve."). In this case, because there is a question of fact as to whether Plaintiff's

beliefs were sincerely held, summary judgment is inappropriate as to Plaintiff's RLUIPA and First Amendment claims against Deacon Shea

## IV.    Conclusion

For the reasons stated, Defendants' Motion for Summary Judgment [108] is granted in part and denied in part. Summary judgment is granted as to (1) all Defendants (Sgt. Moffett and Randi Slater) on Plaintiff's inadequate diet claim; (2) Defendant Taylor on all of Plaintiff's failure to protect claims and Defendant Moffett as to any claim arising out of Plaintiff's July 7, 2018, altercation with inmate Smith; and (3) Defendants Moffett and Slater as to any violation of Plaintiff's religious rights. Summary judgment is denied as to: (1) Plaintiff's claim of failure to protect against Defendant Moffett with regard to his July 29, 2018, altercation with inmate Smith; and (2) Plaintiff's RLUIPA and First Amendment claims against Deacon Shea with regard to the denial of a Kosher diet. The parties are directed to file a joint status report by March 24, 2021 indicating whether they are willing to discuss settlement.

Franklin U. Valderrama
United States District Judge

DATED: March 3, 2021

35